AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Plaintiff,

v.

PAN AMERICAN WORLD AIRWAYS, INC., Defendant.

FLIGHT ENGINEERS' INTERNATIONAL ASSOCIATION, PAA CHAPTER, AFL–CIO, Plaintiff,

v.

PAN AMERICAN WORLD AIRWAYS, INC., Defendant.

Nos. 84 CV 4878, 84 CV 4900.

United States District Court, E.D. New York.

Jan. 11, 1985.

Michael E. Abram, James L. Linsey, Cohen, Weiss & Simon, New York City, for plaintiff Air Line Pilots Association, Intern.

O'Donnell & Schwartz, Asher W. Schwartz, and David B. Rosen, New York City, for FEIA.

Morgan, Lewis & Bockius, New York City, Ernest L. Garb, Harry Rissetto, Tom Reinert, for Pan American World Airways, Inc.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

This is an action under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, brought by the Air Line Pilots Association, International ("ALPA") and the Flight Engineers' International Association, PAA Chapter, AFL–CIO ("FEIA") against Pan American World Airways, Inc. ("PAN AM"). The unions seek a preliminary injunction compelling Pan Am to observe the provisions of the Agreements expiring on January 1, 1985 pending exhaustion of negotiation procedures mandated by the Act.

I agree with the parties that further evidence is unnecessary, as the essential facts are not in dispute. Accordingly, I have consolidated the trial on the merits with the hearing on the instant application in accordance with Rule 65(a)(2) of the Federal Rules of Civil Procedure.

For the reasons developed below, the unions' request for injunctive relief is granted.

### *Facts*

ALPA

ALPA is the collective bargaining representative for Pan Am's pilots. On January 28, 1983 the parties entered into a new basic agreement effective until January 1, 1985. The parties refer to this basic agreement as "the white pages." Also on January 28, 1983, the parties entered an accompanying memorandum of agreement which provides certain concessionary modifica-

tions in the basic agreement as to hours of service, pay and working conditions. These concessionary provisions, included "between the covers" of the basic agreement, are referred to as the "pink pages."

The pink pages constitute temporary revisions to the basic agreement. Those temporary revisions "shall terminate in all respects at 2400 hours on December 31, 1984." Agreement, p. 244, par. 3. The pink pages further provide:

> On and after January 1, 1985, the corresponding provisions of the Agreement between Pan American World Airways, Inc. and its Air Line Pilots as represented by the Air Line Pilots Association, International, dated January 28, 1983, shall be implemented and shall continue in full force and effect thereafter, regardless of whether the parties have exchanged notices of intended change under Section 6 of the Railway Labor Act or are in any phase of negotiations for a new Agreement. *The Company explicitly waives any and all rights whatsoever to claim that any of the temporary revisions ... remain in effect after 2400 hours on December 31, 1984* or that on and after January 1, 1985, the corresponding provisions of the Agreement between Pan American World Airways, Inc. and its pilots as represented by the Air Line Pilots Association International, dated January 28, 1983, should not be implemented and continue in full force and effect thereafter.

*Id.* at 245. (emphasis added).

By letter dated September 19, 1984 Pan Am informed ALPA of its intent to reopen negotiations for a new agreement, pursuant to section 6 of the RLA.[1] In the ensuing months, ALPA took the position that pursuant to the above-quoted contractual provision, the white pages would be applicable to all flights after midnight December 31, 1984. By letter dated November 26, 1984, however, Pan Am informed ALPA that the terms then in effect, i.e., the pink pages, would be continued on and after January 1, 1985. Accordingly, on December 19, 1984, ALPA commenced the instant action seeking injunctive relief.

FEIA

The dispute between Pan Am and the flight engineers is essentially the same as that between Pan Am and ALPA, i.e., a 1983 agreement contained concessionary provisions (pink pages[2]) intended to remain in effect until January 1, 1985. These pink page concessions were not "to continue under Section 6 of the Railway Labor Act beyond January 1, 1985, except by mutual agreement ...." Although the provisions of the FEIA contract are not semantically identical to those contained in

---

1. On January 4, 1985, ALPA raised a question as to whether a § 6 notice was in fact served on ALPA by Pan Am. In order to expedite the proceedings, however, the parties agreed to proceed without taking any testimony on this issue.

The instant decision is obviously premised upon the assumption that the parties are presently engaged in § 6 negotiations and thus, are obligated to maintain the status quo. Assuming *arguendo* that the § 6 notice dated September 19, 1984 was not received by ALPA, however, ALPA's request for injunctive relief would nonetheless be granted. In a letter dated November 26, 1984 the union was apprised of Pan Am's intention to alter the agreement by continuing in effect the pink pages. That letter concluded with the phrase "and that consistent with the Railway Labor Act the terms presently in effect will continue after January 1, 1985." In a letter dated November 28, 1984, ALPA acknowledged receipt of Pan Am's letter.

Pan Am's November 26th letter satisfied the requirement that a carrier give 30 days written notice of its intention to take action that changes an agreement, and, thus, gives rise to a "major" dispute. *Local 553, Transport Workers Union of America v. Eastern Air Lines, Inc.,* 695 F.2d 668, 674 (2d Cir.1982). The dispute between ALPA and Pan Am must be characterized as a major dispute under the RLA since Pan Am's contractual justification for its action is "obviously insubstantial." *Id.* at 673. Thus, even if the September § 6 notice was not served, the parties are nonetheless obliged to maintain the status quo until the major dispute resolution process runs its course. *Id.* at 674.

2. One rather obvious difference in the two contracts is that the pages containing the temporary revisions in the FEIA contract are yellow instead of pink. For the sake of simplicity, however, the concessionary provisions applicable to both ALPA and FEIA will be referred to as the "pink pages."

the ALPA contract, Pan Am has conceded that the legal effect of both agreements is the same.

In the fall of 1984 Pan Am informed FEIA of its intent to reopen negotiations for a new agreement, pursuant to Section 6 of the Railway Labor Act, and that it intended to continue the (pink sheet) rates of pay, rules and working conditions after January 1, 1985. On December 20, 1984, FEIA commenced this action to enjoin Pan Am from continuing to operate under the concessionary provisions after January 1, 1985.

### Discussion

Section 6 of the Railway Labor Act provides in pertinent part as follows:

Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions.... In every case where such notice of intended change has been given, rates of pay, rules or working conditions shall not be altered by the carrier until the controversy has been finally acted upon as required by Section 155 of this Title....

■■ This so-called "status quo requirement" of Section 6 mandates that the parties

... preserve and maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute.

*Detroit & Toledo Shore Line R. Co. v. United Transportation Union*, 396 U.S. 142, 153, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969). *See also Air Cargo, Inc. v. Local Union 851, Teamsters*, 733 F.2d 241, 246 (2d Cir.1984). The Supreme Court has termed the *status quo* requirement as central to the RLA's design because it facilitates labor peace. *Id.*, 396 U.S., at 150, 90 S.Ct., at 299. Moreover, the courts have consistently held that violations of the *status quo* are enjoinable. *See Manning v. American Airlines*, 329 F.2d 32, 34 (2d Cir.1964), *cert. denied*, 379 U.S. 817, 85 S.Ct. 33, 13 L.Ed.2d 29 (1964); *Air Cargo, Inc., supra*, at 247.

Thus, in the case at hand I am asked to decide what constitutes the status quo. Pan Am contends that the status quo consists of the concessionary rates and conditions (the pink sheets) in effect immediately prior to the expiration of the Agreement. The unions argue, however, that the parties have by agreement rendered the white pages the status quo.

■■ It is the general rule that in determining the status quo a court must look to the actual conditions in effect prior to the expiration of an agreement rather than to the terms of the agreement itself. As Chief Judge Weinstein has stated:

The Railway Labor Act does not preserve employment contracts beyond their expiration date. It preserves pay rates, working conditions and rules during contract negotiations.

*Transport Workers v. Eastern Airlines*, 544 F.Supp. 1315 (E.D.N.Y.1982).

Significant to the instant dispute, however, are the cases indicating that the parties' agreements *can* constitute the status quo. To appreciate this line of authority, however, it is necessary to focus on the origin of the rule that conditions, not contracts, are preserved.

In *Detroit & Toledo Shore Line*, the Supreme Court noted that "the status quo extends to those actual, objective working conditions out of which the dispute arose, and *clearly these conditions need not be covered in an existing agreement.*" 396 U.S. at 153, 90 S.Ct. at 301 (emphasis added). In other words, even if an agreement is silent as to a carrier's authority to take a particular action, that authority may still constitute the status quo if the carrier has repeatedly taken the action over the years and the union has acquiesced.

It is true that courts determining the status quo in the wake of *Detroit & Toledo Shore Line* have placed emphasis on actual conditions, and not agreements. Indeed this approach has recently been reiterated

by the Second Circuit in *Air Cargo, Inc. v. Local Union 851*, 733 F.2d 241, 246 (2d Cir.1984). However, the Second Circuit went on to observe the following:

> The objective working conditions on the actual date of the agreement's expiration, however, do not always constitute the statutory status quo. Otherwise, a party could take any action it wanted on the last day of an agreement and call that the status quo. Instead, there must be a 'mutual understanding, either express or implied' to turn a party's behavior into the RLA section 6 status quo.

Accordingly, the Second Circuit remanded the case with an instruction that the district court determine whether the actual agreement or the parties' behavior established the statutory status quo.

■ Since it is clear that parties to a labor contract may establish the status quo by their actions or *informal* agreements, it seems logical that, a fortiori, they may determine the status quo by *express* contractual provisions. Put another way, since the Second Circuit has noted above that a "mutual understanding, either express or implied" may turn a party's behavior into the status quo, it surely follows that they may expressly agree in an appropriate instance that certain temporary actions are *not* to be construed as the status quo.

■ It is significant that the "conditions" that Pan Am now considers to be the status quo are derived from the very agreement that contains Pan Am's express waiver of a right to argue that the pink pages survive their expiration date under § 6 or otherwise. That agreement clearly states that the white pages will constitute the status quo during the negotiation period in 1985.

It is certainly reasonable to infer that the unions might not have made the concessions in the first place were it not for the parties' agreement that the temporary concessions should not be considered the status quo. If I applied Pan Am's interpretation of the status quo, I would be promoting the very sort of labor unrest which the statutory status quo provision was designed to prevent. Accordingly, I find that the parties have validly agreed that the white pages of the agreement shall constitute the status quo during the § 6 negotiation period.

Since I have consolidated the instant application for a preliminary injunction with the trial on the merits, and since injunctive relief is mandated by section 6, it appears unnecessary to address the issue of irreparable harm. *See Local 553, Transport Workers Union of America v. Eastern Airlines, Inc.*, 695 F.2d 668, 677 (2d Cir. 1982). For the record, however, I note that an adequate showing has been made that the unions will be irreparably harmed absent an immediate grant of injunctive relief.

First, it would be nearly impossible months from now to reconstruct the scenario that would have ensued if Pan Am had operated under the white pages of the agreement. Essentially, the scheduling of flight assignments is determined monthly pursuant to a bidding procedure. Each month, Pan Am is required to determine its patterns of flying for the next month and to construct and distribute "bid lines." The bid line package sets forth the times, places and number of compensable hours associated with each month long "line" of flight assignments. The bid lines are then awarded to each pilot and flight engineer according to seniority by consideration of the bids they have submitted.

Although bidding for job lines is based on a number of factors, one of the most important is the number of compensable hours associated with each line. Essentially, compensable or credited hours consist of a combination of flight hours and credit for periods on duty, time away from the base and other factors specified in the Agreement. The rules for computing credited hours were temporarily modified by the pink pages. Thus, if bids were made on the basis of concessionary bid lines which are later held invalid, it would be virtually

impossible to reconstruct the system on the basis of valid bid lines.

In addition to the difficulty of recalculating bid lines, the unions also maintain that negotiations between the parties are being irreparably harmed by Pan Am's refusal to comply with its agreements. The unions emphasize the difficulty they will experience in selling an agreement to the rank and file when Pan Am openly refuses to honor its previous commitments. Absent injunctive relief, the unions will be placed in a position of having to bargain for what they have already obtained.

### Conclusion

The Court is aware that the bid lines for January have already been constructed and that the issuance of revised January bidlines at this point would be unduly burdensome. Accordingly, the motion to require Pan Am to reconstruct its previously issued bid lines pursuant to the white pages of the agreement is denied. In all other respects, however, the motions for injunctive relief are granted. Accordingly, as to all bid lines yet to be distributed, Pan Am shall construct those bid lines in accordance with the non-concessionary provisions of the Agreement.

SO ORDERED.